WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent,

and

Keith Boyd, Intervenor.

No. 07–AA–748.

District of Columbia Court of Appeals.

Argued Nov. 12, 2008.

Decided Feb. 5, 2009.

Sarah O. Rollman, Associate General Counsel, with whom Carol B. O'Keeffe, General Counsel, and Mark F. Sullivan, Deputy General Counsel, were on the brief, for petitioner.

Linda Singer, Attorney General for the District of Columbia at the time, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and William J. Earl, Senior Assistant Attorney General, filed a statement in lieu of brief in support of intervenor.

Craig A. Rosenstein, Riverdale, MD, for intervenor.

Before KRAMER and FISHER, Associate Judges, and SCHWELB, Senior Judge.

FISHER, Associate Judge:

The Compensation Review Board affirmed an Administrative Law Judge's determination that Keith Boyd was entitled to additional workers' compensation benefits for temporary total disability ("TTD") although he previously had received a schedule award based on the same injury. We reverse and remand for further proceedings not inconsistent with this opinion.

## I. Factual and Procedural Background

In 2002 Keith Boyd injured his left knee while working for WMATA. The resulting treatment included surgery, and WMATA voluntarily paid temporary total disability benefits and related medical expenses. In February 2004, the parties agreed that Mr. Boyd would receive a "schedule award" for a permanent partial disability of 15% of his left lower extremity.[1] Following another surgery, WMATA voluntarily paid additional TTD benefits and Boyd again reached maximum medical improvement. The parties have stipulated that Mr. Boyd is entitled to an increase in the schedule award to equal a 20% partial loss to his left lower extremity, but they dispute whether he was entitled to the TTD benefits WMATA paid after he received the initial schedule award. WMATA argued that it had paid those benefits by mistake and that it was therefore entitled to a credit against the increase in the schedule award.

Agreeing that there were no facts in dispute, the parties submitted the legal issue to the Department of Employment Services. Purporting to rely upon our decision in *Cherrydale Heating & Air Conditioning v. District of Columbia Dep't of Employment Servs.*, 722 A.2d 31 (D.C. 1998), which we will discuss in more detail later, the ALJ held that Mr. Boyd was entitled to additional TTD benefits after receiving the initial schedule award. Therefore, WMATA was not entitled to a credit for those payments against the amount it owed for the additional schedule award.

The CRB affirmed for different reasons. It concluded that the ALJ had erred in her reasoning because Mr. Brown had not met the rigorous test recognized in *Cherrydale*. Nevertheless, the CRB held that Mr. Brown was entitled to the new round of TTD benefits because our decisions in *Cherrydale* and *Smith v. District of Columbia Dep't of Employment Servs.*, 548 A.2d 95 (D.C.1988), do not apply to a request for "modification based upon a change of conditions occurring within a year of a schedule award...." *See* D.C.Code § 32–1524(a) (2001).[2]

1. A "schedule award" refers to the formula for compensating permanent partial disability described in D.C.Code § 32–1508(3)(A)–(S) (2001 & Supp.2008), which lists certain parts of the body. If one of these parts is permanently disabled, the worker is entitled to disability payments based on the number of weeks' compensation listed for that body part. *See, e.g., Howard University Hospital/Property & Casualty Guarantee Fund v. District of Columbia Dep't of Employment Servs.*, 952 A.2d 168, 171 n. 1 (D.C.2008). For example, if a worker has lost a leg, he would be entitled to 66 2/3% of his average weekly wage for 288 weeks. The initial schedule award to Mr. Boyd entitled him to 15% of that amount.

For present purposes, we do not distinguish between a schedule award agreed to by stipulation of the parties and one ordered by an ALJ.

2. D.C.Code § 32–1524(a) (2001), entitled "Modification of Awards," provides:

(a) At any time prior to 1 year after the date of the last payment of compensation or at any time prior to 1 year after the rejection of a claim, provided, however, that in the case of a claim filed pursuant to § 32–1508(a)(3)(V) the time period shall be at any time prior to 3 years after the date of the last payment of compensation or at any time prior to 3 years after the rejection of a

## II. Legal Analysis

■ This case is governed by a legal principle established in *Smith* and a narrow exception to that principle recognized in *Cherrydale*. In *Smith,* an injured employee "had reached maximum medical improvement" and she and her employer (coincidentally, WMATA) stipulated that she "was entitled to benefits in the nature of a schedule award ... for a 5 percent permanent partial disability of her right upper extremity." 548 A.2d at 96. The agency approved the stipulation, and the award was paid, but within one year a "flare up" of her condition caused her to miss work, and she applied for temporary total disability benefits. *Id.* The Department of Employment Services denied the application "on the ground that she had already received all of the benefits to which she was entitled." *Id.*

Having examined the language and legislative history of the workers' compensation statute, "we infer[red] that [the] Council did not intend to provide such additional benefits after an employee has received a schedule award for the same injury." *Id.* at 99 (footnote omitted). We explained that a schedule award was not a departure from the principle that "compensation under the Act is predicated upon the loss of wage earning capacity, or economic impairment, and not upon functional disability or physical impairment." *Id.* at 100 (footnote omitted). " 'The basic theory remains the same; the only difference is that the effect on earning capacity is a conclusively presumed one, instead of a specifically proved one based on the individual's actual wage-loss experience.' " *Id.*

at 101 (quoting 2 A. LARSON, WORKMEN'S COMPENSATION LAW, § 58.11, at 10–323 to 10–324 (1987) (footnotes omitted)). "Although the schedule award will be overly generous in some cases, and grievously inadequate in others, such a result inheres in the very nature of compensation schemes." *Id.* at 102. We therefore "affirm[ed] the agency's decision denying Smith temporary total disability benefits on the ground that she was ineligible because of prior receipt of a schedule award for permanent partial disability arising out of the same injury." *Id.*

Ten years later, we applied the holding of *Smith* to the consolidated cases of two workers who had received schedule awards. *Cherrydale,* 722 A.2d 31. Both claimants had further surgery after receiving their award and both claimed they were entitled to additional benefits for temporary total disability. The Director awarded further TTD benefits to one worker, but denied them to the other. The petitioners asserted that these decisions were inconsistent with each other and with our decision in *Smith,* which had upheld the Director's determination that the Workers' Compensation Act generally barred an award of further temporary total disability benefits stemming from the same injury once the worker had received a schedule award for a permanent partial disability. *Id.* at 32.

We affirmed the Director's decision in each of the cases under review in *Cherrydale,* concluding that they rested "upon a reasonable interpretation of the governing statute: specifically, that the amputation

---

claim, the Mayor may, upon his own initiative or upon application of a party in interest, order a review of a compensation case pursuant to the procedures provided in § 32–1520 where there is reason to believe that a change of conditions has occurred which raises issues concerning:

(1) The fact or the degree of disability or the amount of compensation payable pursuant thereto; or
(2) The fact of eligibility or the amount of compensation payable pursuant to § 32–1509.

undergone by claimant Poole ... justifies a narrow departure from the general prohibition recognized in *Smith,* but that the lesser change of condition experienced by claimant Evans ... does not." 722 A.2d at 32. We read the Director's decision in Poole's case "as recognizing a narrow exception to the general rule for an extreme change of condition resulting in amputation or its functional equivalent." *Id.* at 34. "It is certainly reasonable to regard amputation as an extraordinary condition that 'affects ... the body itself'—that in effect causes *re*—injury to the body-in a way that lesser treatment including surgery does not." *Id.* (citation omitted). "[B]oth the trauma associated with amputation and the length of convalescence (and wage loss) presumed to accompany such intervention could fairly be seen by the Director to warrant a narrow exception to the conclusiveness of a schedule award for permanency." *Id.* at 35 (footnote omitted).

"At the same time, the Director was not convinced that the deterioration in petitioner Evans' condition justified benefits outside the framework of the previous schedule award...." *Id.* at 35. Evans' need for further surgery "was foreseeable and within the conclusively presumed ... effect on future earnings potential that a schedule award embodies...." *Id.* (internal quotation marks and citation omitted). Nevertheless, Evans argued that the Director's reading of *Smith* "contravenes D.C.Code § 36–324(a) [now codified at D.C.Code § 32–1524(a) (2001)], which allows modification of an award ... 'where there is reason to believe that a change of conditions has occurred.'" Rejecting this argument, we held: "That general [statu-

tory] authorization to permit modification ... must be read in tandem with the limitation recognized in *Smith*.... [I]f a claimant's 'condition deteriorates to the point where she can demonstrate a permanent partial disability in excess of' the previous percentage rating, we said in *Smith,* 'she would be statutorily entitled to an additional schedule award ...,' not temporary total disability benefits." 722 A.2d at 35–36, quoting *Smith,* 548 A.2d at 101 n. 20. The previous sentence accurately describes the case now before us.

We normally defer to an agency's construction of the statute it administers, but we owe no deference to its interpretation of our decisions. *Dorchester House Associates Limited P'ship v. District of Columbia Rental Housing Commission,* 913 A.2d 1260, 1263 (D.C.2006). In this case the CRB simply misunderstood *Cherrydale.* It thought *Cherrydale* did not apply when deterioration has occurred within one year and the schedule award is subject to modification under D.C.Code § 32–1524. But *Cherrydale* and *Smith* specifically referred to the modification provision, which was then codified at D.C.Code § 36–324 (1981). *Cherrydale,* 722 A.2d at 35–36; *Smith,* 548 A.2d at 101 n. 20. The *Smith* line of cases establishes that absent extraordinary circumstances—an amputation or its functional equivalent—TTD benefits will not be awarded for the same injury after the worker has reached maximum medical improvement and a schedule award has been made, even if the request for additional TTD benefits is made within one year of the schedule award.[3] Thus,

---

3. We did not impose the rule in *Smith,* but upheld as reasonable the Director's interpretation of the workers' compensation statute. The same was true in *Cherrydale.* There is no indication in this case that the Director (through the CRB) was changing the interpre-

tation he had adopted—and we upheld—in *Smith* and *Cherrydale.* Absent clear language indicating a change in agency policy, we adhere to our holdings in *Smith* and *Cherrydale.* See *Watergate East, Inc. v. Public Service Commission,* 665 A.2d 943, 947 (D.C.1995) ("[A]n

the CRB erred in attempting to distinguish this case from *Cherrydale* and *Smith.*[4]

In the administrative proceedings, WMATA argued that the amount of TTD benefits voluntarily paid following the most recent surgery should be credited against the increase in the schedule award. The CRB did not reach that issue, however. At oral argument, counsel for the employer specifically requested that we refrain from addressing that issue, submitting that it should be considered by the agency in the first instance.

### III. Conclusion

The CRB erred in holding that Mr. Boyd was entitled to additional TTD benefits. The judgment of the CRB is reversed, and this matter is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored...." (quoting *Greater Boston Television Corp. v. FCC,* 143 U.S.App. D.C. 383, 394, 444 F.2d 841, 852 (1970))).

4. We agree with that portion of the CRB's ruling which rejected the ALJ's rationale. The additional surgery in this case is not the equivalent of an amputation. Thus, the circumstances of this case do not fit within the narrow exception to *Smith* that we upheld in *Cherrydale.*